# Exhibit 1

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| JAMES FOUNDS, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL BEVERAGE CORP.,<br><br>Defendant. | CIVIL DIVISION<br><br>No. G.D. 25-__________<br><br>**COMPLAINT**<br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

Counsel of Record for Plaintiffs:

Steffan T. Keeton
Pa I.D. No. 314635

The Keeton Firm LLC
100 S Commons, Ste. 102
Pittsburgh, PA 15212
(888) 412-5291
stkeeton@keetonfirm.com

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| JAMES FOUNDS, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL BEVERAGE CORP.,<br><br>Defendant. | CIVIL DIVISION<br><br>No. G.D. 25-____________<br><br>**COMPLAINT**<br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## NOTICE TO DEFEND

**You have been sued in Court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served by entering a written appearance personally, or by attorney, and filing in writing with the Court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so, the case may proceed without you, and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint, or for any other claim or relief requested by the Plaintiff(s). You may lose money, or property, or other rights important to you.**

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.**

**LAWYER REFERRAL SERVICE**
**Allegheny County Bar Association**
**400 Koppers Building**
**436 Seventh Avenue**
**Pittsburgh, PA 15219**
**Telephone: (412)-261-5555**
**https://www.getapittsburghlawyer.com/**

# TABLE OF CONTENTS

**INTRODUCTION** ... **1**

**JURISDICTION AND VENUE** ... **4**

**PARTIES** ... **4**

**FACTS** ... **6**

A. Defendant manufactures, markets, distributes and sells the Products. ... 6
B. The Products contain Brominated Vegetable Oil. ... 8
C. Brominated Vegetable Oil is dangerous. ... 9
D. The dangers presented by the consumption of Brominated Vegetable Oil have been known for decades. ... 11
E. Brominated Vegetable Oil is banned in the United States of America. ... 14
F. Reasonable consumers relied on Defendant's misrepresentations to their detriment. ... 15
G. Defendant's wrongful conduct caused Plaintiff's and the Class Members' injuries. ... 15
H. Defendant deceives consumers by misrepresenting that the Products are lawful and safe. ... 19
I. The Products are misbranded. ... 21

**CLASS DEFINITIONS AND ALLEGATIONS** ... **23**

**CAUSES OF ACTION** ... **25**

COUNT I: Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law ... 25
COUNT II: Breach of the Implied Warranty of Merchantability ... 28
COUNT III: Fraudulent Concealment ... 31
COUNT IV: Negligent Misrepresentation ... 34
COUNT V: Unjust Enrichment ... 35
COUNT VI: Negligence ... 36
COUNT VII: Negligent Failure to Warn ... 38
COUNT VIII: Strict Products Liability ... 40

**RELIEF DEMANDED** ... **42**

**JURY DEMAND** ... **43**

Plaintiff James Founds brings this action on behalf of himself and all others similarly situated against Defendant NATIONAL BEVERAGE CORP. Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## INTRODUCTION

1. This case arises from Defendant's deceptive and misleading practices with respect to its marketing and sale of its Faygo® brand of food products (the "Products" or "Product").[1]







[1] At the time of this filing, the following flavors are included in this definition: Fruit Punch. On information and belief, additional flavors contain BVO, and this definition will be expanded as the litigation develops.

2. Defendant manufactures, distributes, markets, labels and sells the Product.

3. Defendant deceptively represents the Product as authorized for sale and safe for consumption.

4. Plaintiff relied upon this representation when he purchased the Product.

5. The deception lies in the fact that the Product is not authorized for sale because it contains the unsafe and prohibited ingredient Brominated Vegetable Oil ("BVO").




6. BVO was originally patented as a flame retardant for plastics.[2]

7. Consumption of BVO is dangerous.

8. BVO is not authorized for use in food and beverage products.

9. BVO consumption is shown to damage the "hearts, kidneys, livers and testicles" of mammals.[3]

---

[2] Mikaela Conley, *Flame Retardant in Your Mountain Dew? Yep*, ABC NEWS (Dec. 15, 2011), https://abcnews.go.com/blogs/health/2011/12/15/flame-retardant-in-your-mountain-dew-yep.

[3] Madeline Holcombe, *The FDA will no longer allow this potentially harmful additive found in some sodas*, CNN (July 3, 2024), https://www.cnn.com/2024/07/02/health/fda-brominated-vegetable-oil-ban-wellness.

10. "Multiple peer-reviewed studies found the chemical causes neurological problems and increases fat and cholesterol in the heart and liver."[4]

11. BVO "can cause organs and tissues, including the thyroid, to accumulate bromide at potentially harmful levels."[5]

12. Consumption of BVO "can disrupt neurological functions, as the brain is especially sensitive to chemical imbalances."[6]

13. Unlike its competitors that have removed BVO from their food and beverage products,[7] Defendant continues – as it has for decades – to include BVO in the Products.

14. While now banned throughout the United States, legislators in numerous states have explored legislation that would ban BVO in food products.

---

[4] Meghan Moriarty, *'You'd be surprised!' Groceries banned overseas for health concerns still on Pittsburgh shelves*, WPXI (May 23, 2023), https://www.wpxi.com/news/local/youd-be-surprised-groceries-banned-overseas-health-concerns-still-pittsburgh-shelves/2J6RFZSRYZFVBBNZY5TGMM74HQ/.

[5] Elisabeth Anderson, *Trending – Brominated Vegetable Oil (BVO)*, MICHIGAN STATE UNIVERSITY CENTER FOR RESEARCH ON INGREDIENT SAFETY (Nov. 6, 2023), https://cris.msu.edu/news/trending/trending-brominated-vegetable-oil-bvo/.

[6] *FDA Moves to Ban BVO Amid Neurological And Other Health Concerns*, PSYCHIATRIST.COM (Nov. 6, 2023), https://www.psychiatrist.com/news/fda-moves-to-ban-bvo-amid-neurological-and-other-health-concerns/.

[7] Zoë Schlanger, *Coke to Remove Flame-Retardant Chemical From All Its Drinks*, NEWSWEEK (May 5, 2014), https://www.newsweek.com/coke-remove-flame-retardant-chemical-all-its-drinks-249616.

15. In March 2024, Pennsylvania Representative Melissa Shusterman sponsored a bill that, in part, would ban the use of BVO in food products, and the bill received bipartisan support.[8]

16. Based on decades of research indicating that consumption of BVO is dangerous, it is not authorized to be used as an ingredient in food and beverage products sold in the Commonwealth of Pennsylvania and throughout the United States.

17. Plaintiff and Class Members relied on these representations and omissions and were injured both in the price paid for the Product as well as the premium paid for the Product over a similar product not bearing these deceptive representations.

18. Reasonable consumers would not have purchased the Products if they had known about the misrepresentations and omissions, or would have purchased them on different terms.

19. Plaintiff brings this action individually and on behalf of those similarly situated and seeks to represent a Pennsylvania Class and a Nationwide Class. Plaintiff seeks damages, interest thereon, reasonable attorneys' fees and costs, restitution, other equitable relief, and disgorgement of all benefits Defendant has enjoyed from its unlawful and deceptive business practices, as detailed herein. In

[8] *See* Pennsylvania General Assembly, House Bill 2117, 2023-2024 Regular Session, *available at* https://www.palegis.us/legislation/bills/2023/hb2117.

addition, Plaintiff seeks injunctive relief to stop Defendant's unlawful and deceptive conduct in the labeling and marketing of the Products and conduct a corrective advertising campaign.

## JURISDICTION AND VENUE

20. Jurisdiction and venue in this Court are proper because, *inter alia*, the Defendant regularly conducts business in this County, and transactions or occurrences giving rise to the causes of action occurred in this County.

## PARTIES

21. Plaintiff is a citizen of Pennsylvania, residing in Allegheny County.

a. After August 2, 2025, Plaintiff purchased Defendant's Product from retailers in Allegheny County.

b. He purchased multiple 12 oz. cans of the Fruit Punch.

c. Prior to his purchases, Plaintiff saw and relied on Defendant's packaging and labeling representing that the Product was authorized for sale and safe to consume.

d. Plaintiff wished to purchase the Product for personal consumption. When Plaintiff saw Defendant's misrepresentations prior to and at the time of purchase, he relied on Defendant's representations and omissions about the Products.

e. At the time of sale, the Product did not contain warnings, disclaimers, or any other language indicating that the Product was not authorized for sale nor safe to consume.

f. Plaintiff understood these representations to mean the Products were authorized for sale and safe to consume. Had Plaintiff known the truth, he would not have purchased the Products on the same terms.

g. Plaintiff brings the claims below seeking damages, actual and statutory, as well as injunctive relief.

22. Defendant NATIONAL BEVERAGE CORP. is a corporation organized the laws of Florida with its principal place of business located in Plantation, FL.

a. Defendant produces, markets, distributes, and sells its consumer food products in retail stores throughout the Commonwealth of Pennsylvania.

b. At all relevant times, Defendant was engaged in manufacturing, marketing, distributing, and advertising its Product throughout Pennsylvania.

23. Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

24. Whenever reference is made in this Complaint to any representation, act, omission, or transaction of a defendant, that allegation shall mean that the defendant did the act, omission, or transaction through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or ostensible scope of their authority.

## FACTS

### A. Defendant manufactures, markets, distributes and sells the Products.

25. Defendant owns, manufactures, and sells branded foods listed by the U.S. Department of Agriculture as a product that contains brominated vegetable oil.

26. Defendant selects the ingredients in the Products, manufactures the Products, markets the Products, distributes the Products, and sells the Products.

27. Defendant creates the formulas for the Products.

28. Defendant selects the information that appears on the Products' packaging.

29. At all relevant times, Defendant controls the Products in the marketplace.

30. Defendant voluntarily selected BVO as an ingredient and inserted it in the Products.

31. The Products did not originally contain BVO as an ingredient.


Faygo
Fruit Punch Soda


Fruit Punch Soda
Carbonated Water, Sugar, Concentrated Orange Juice, Natural
Grape and Strawberry Flavoring, Citric Acid, Artificial Color and
Flavor, Benzoate of Soda as Preservative.
.001% Stannous Chloride as preservative.
Fruit Punch Soda


Faygo
fruit
punch
soda
artificially flavored
12 Fl. Oz.


fruit
punch
soda
FAYGO BEVERAGES INC., DETROIT, MICHIGAN 48207. CONTAINS CARBONATED WATER, SUGAR, CONCENTRATED ORANGE JUICE, BENZOATE OF SODA & STANNOUS CHLORIDE AS PRESERVATIVE, CITRIC ACID, ORANGE PEEL FLAVOR, ARTIFICIAL COLOR & FLAVOR.

32. After Faygo was acquired by Defendant, Defendant began inserting BVO in the Products.







33. Defendant voluntarily places the Products into the stream of commerce.

34. Defendant can remove the Products from the marketplace.

**B. The Products contain Brominated Vegetable Oil.**

35. The Products contain Brominated Vegetable Oil.



36. BVO is a chemical compound and additive that combines vegetable oil, usually soybean or palm, with bromine to prevent oil from separating, stabilizing ingredients and unifying textures in beverages.[9]

37. BVO lets manufacturers affordably prevent oil- and water-based ingredients from separating, which would otherwise give drinks an unappealing, cloudy appearance.[10]

38. Defendant uses BVO for marketing purposes: to ensure the Product has an appealing, uniform, and consistent color.

39. Cost-effective and cost-competitive BVO alternatives exist, and companies have used them in products sold in other countries.[11]

40. Defendant, however, in its drive for increased sales and increased profits has decided to use the dangerous banned ingredient BVO.

**C. Brominated Vegetable Oil is dangerous.**

41. The consumption of BVO is hazardous to humans.

42. In the 1970's, a study showed that BVO consumption by mammals damaged their "hearts, kidneys, livers and testicles."[12]

---

[9] Kayleigh Holcombe, *Beware of the chemical BVO in fruit-flavored drinks*, ENVIRONMENTAL WORKING GROUP (Apr. 3, 2025), https://www.ewg.org/news-insights/news/2025/04/beware-chemical-bvo-fruit-flavored-drinks.
[10] *Id.*
[11] *Id.*
[12] Madeline Holcombe, *The FDA will no longer allow this potentially harmful additive found in some sodas*, CNN (July 3, 2024), https://www.cnn.com/2024/07/02/health/fda-brominated-vegetable-oil-ban-wellness.

43. Additionally, "brominated oil is potentially harmful to the thyroid, liver and heart and could cause neurological problems."[13]

44. "Multiple peer-reviewed studies found the chemical causes neurological problems and increases fat and cholesterol in the heart and liver."[14]

45. BVO "can cause organs and tissues, including the thyroid, to accumulate bromide at potentially harmful levels."[15]

46. Consumption of BVO "can disrupt neurological functions, as the brain is especially sensitive to chemical imbalances."[16]

47. "High levels of bromine have been associated with neurological symptoms such as memory loss, tremors, fatigue, and headaches—a constellation of effects known as bromism."[17]

---

[13] Sally Robinson, *Brominated Oil Fruit Drinks Have Harmful Effects*, UTMB HEALTH (Nov. 17, 2023), https://www.utmb.edu/pedi/categories-tags/2023/11/17/toxic-stress-and-the-long-term-effects.

[14] Meghan Moriarty, *'You'd be surprised!' Groceries banned overseas for health concerns still on Pittsburgh shelves*, WPXI (May 23, 2023), https://www.wpxi.com/news/local/youd-be-surprised-groceries-banned-overseas-health-concerns-still-pittsburgh-shelves/2J6RFZSRYZFVBBNZY5TGMM74HQ/.

[15] Elisabeth Anderson, *Trending – Brominated Vegetable Oil (BVO)*, MICHIGAN STATE UNIVERSITY CENTER FOR RESEARCH ON INGREDIENT SAFETY (Nov. 6, 2023), https://cris.msu.edu/news/trending/trending-brominated-vegetable-oil-bvo/.

[16] *FDA Moves to Ban BVO Amid Neurological And Other Health Concerns*, PSYCHIATRIST.COM (Nov. 6, 2023), https://www.psychiatrist.com/news/fda-moves-to-ban-bvo-amid-neurological-and-other-health-concerns/.

[17] *Id.*

48. For example, one person's symptoms were so severe that they were evaluated for a "a central nervous system lesion" and were "no longer able to walk."[18]

49. The inclusion of BVO in food products is not safe and presents an undue hazard to consumers.

**D. The dangers presented by the consumption of Brominated Vegetable Oil have been known for decades.**

50. BVO was first used as a food ingredient in the 1920's.[19]

51. Concerns about BVO's safety have existed since the 1960's.[20]

52. " In the late 1960s, the FDA became aware of questions about the safe use of BVO and removed it from the '[Generally Recognized as Safe] list'. However, there was not enough data to restrict its use overall. Instead, the agency limited the use of BVO as a flavoring oil stabilizer in fruit-flavored beverages at a reduced use level and began regulating it as a food additive."[21]

53. "On January 27, 1970, the FDA concluded that the use of BVO in food was not GRAS because of toxicity concerns under the conditions of use at the time. Studies performed by other regulatory agencies and research institutions on test

---

[18] Horowitz, B Z., *Bromism from excessive cola consumption*, JOURNAL OF TOXICOLOGY. CLINICAL TOXICOLOGY vol. 35,3 (1997): 315-20.
[19] FDA, *Brominated Vegetable Oil (BVO)*, https://www.fda.gov/food/food-additives-petitions/brominated-vegetable-oil-bvo.
[20] Center for Science in the Public Interest, *Brominated Vegetable Oil (BVO)*, https://www.cspi.org/article/brominated-vegetable-oil-bvo.
[21] FDA, *Brominated Vegetable Oil (BVO)*, https://www.fda.gov/food/food-additives-petitions/brominated-vegetable-oil-bvo.

animals that were fed BVO at levels that far exceeded estimates of most human consumption raised concerns about possible effects on the heart. The available safety data did not indicate an immediate health threat from the limited use of BVO in beverages but did not establish a level at which BVO could be safely used in food over a person's lifetime."[22]

54. "In so doing, the FDA permitted its use only on an 'interim' basis pending additional study—one of only four such additives currently listed in federal regulations. Health concerns at the time included that consuming BVO leaves residues in body fat and the fat in the brain, liver, and other organs. Animal studies found that BVO is transferred from mother to the nursing infant and also can cause microscopic changes to heart cells, fatty changes in the liver, impaired growth, and behavioral development."[23]

55. In 1970, the United Kingdon banned the use of BVO in food products.[24]

56. In 1990, India banned the use of BVO in food products.[25]

57. In 2008, the European Union banned the use of BVO in food.[26]

---

[22] *Id.*
[23] Center for Science in the Public Interest, *Brominated Vegetable Oil (BVO)*, https://www.cspi.org/article/brominated-vegetable-oil-bvo.
[24] Paul Bendig, Lisa Maier, Walter Vetter, *Brominated vegetable oil in soft drinks – an underrated source of human organobromine intake*, 133 FOOD CHEMISTRY 3 (2012) at 678-682.
[25] Center for Science in the Public Interest, *Brominated Vegetable Oil (BVO)*, https://www.cspi.org/article/brominated-vegetable-oil-bvo.
[26] *Id.*

58. In 2010, Japan banned the use of BVO in food products.[27]

59. These dangers have led companies to make different versions of their products: "one without these additives that is sold in Europe and another with additives that can be found in the United States."[28]

60. Cost-effective and cost-competitive BVO alternatives exist.[29]

61. By 2012, only 15% of sodas sold in America contained BVO.[30]

62. "On May 16, 2022, the FDA published a study in the journal Food and Chemical Toxicology that evaluated potential health effects related to BVO consumption in rodents. The FDA measured the amounts of BVO present in the animal food and brominated fats in tissues from test animals. We also fed test animals amounts of BVO that simulate real-life exposure. The data from the study suggest that oral exposure to BVO is associated with increased tissue levels of bromine and that at high levels of exposure the thyroid is a target organ of potential

---

[27] *Id.*

[28] Meghan Moriarty, *'You'd be surprised!' Groceries banned overseas for health concerns still on Pittsburgh shelves*, WPXI (May 23, 2023), https://www.wpxi.com/news/local/youd-be-surprised-groceries-banned-overseas-health-concerns-still-pittsburgh-shelves/2J6RFZSRYZFVBBNZY5TGMM74HQ/.

[29] Kayleigh Holcombe, *Beware of the chemical BVO in fruit-flavored drinks*, ENVIRONMENTAL WORKING GROUP (Apr. 3, 2025), https://www.ewg.org/news-insights/news/2025/04/beware-chemical-bvo-fruit-flavored-drinks.

[30] Paul Bendig, Lisa Maier, Walter Vetter, *Brominated vegetable oil in soft drinks – an underrated source of human organobromine intake*, 133 FOOD CHEMISTRY 3 (2012) at 678-682.

negative health effects in rodents. The agency also conducted a study to identify the level of BVO in the body after consumption of BVO."[31]

63. While now banned throughout the United States, legislators in numerous states have explored legislation that would ban BVO in food products.

64. In March 2024, Pennsylvania Representative Melissa Shusterman sponsored a bill that, in part, would ban the use of BVO in food products, and the bill received bipartisan support.[32]

**E. Brominated Vegetable Oil is banned in the United States of America.**

65. In November 2023, the FDA announced a proposal to ban BVO.[33]

66. On July 3, 2024, the FDA issued a final rule to revoke the regulation allowing the use of BVO in food.[34]

67. On August 2, 2024, this final rule went in to effect.[35]

68. Companies that make products containing BVO were given one year to comply with this rule.[36]

---

[31] FDA, *Brominated Vegetable Oil (BVO)*, https://www.fda.gov/food/food-additives-petitions/brominated-vegetable-oil-bvo.
[32] *See* Pennsylvania General Assembly, House Bill 2117, 2023-2024 Regular Session, *available at* https://www.palegis.us/legislation/bills/2023/hb2117.
[33] Kristen Rogers, *FDA proposes ban on potentially harmful ingredient found in some sodas*, WTAE (Nov. 3, 2023), https://www.wtae.com/article/fda-proposes-ban-on-potentially-harmful-ingredient-found-in-sodas/45733179.
[34] FDA, *Brominated Vegetable Oil (BVO)*, https://www.fda.gov/food/food-additives-petitions/brominated-vegetable-oil-bvo.
[35] *Id.*
[36] *Id.*

69. All food products in the marketplace after August 2, 2025 cannot contain BVO.

70. The production, distribution, and sale of Products containing Brominated Vegetable Oil is unlawful and deceptive.

**F. Reasonable consumers relied on Defendant's misrepresentations to their detriment.**

71. Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

72. Plaintiff and the Class Members reasonably relied to their detriment on Defendant's misleading representations and omissions.

73. Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled the Plaintiff and the Class Members.

**G. Defendant's wrongful conduct caused Plaintiff's and the Class Members' injuries.**

74. Defendant knows that consumers are willing to pay more for food products that are represented as being lawful and safe to consume.

75. Plaintiff bargained for a product that was safe to consume and was thus deprived of the basis of their bargain when Defendant sold them a Product—intended to be consumed—containing BVO which becomes toxic with consumption,

thereby exposing Plaintiff and Class Members to potentially severe health consequences.

76. As an immediate, direct, and proximate result of Defendant's false and misleading representations, Defendant injured the Plaintiff and the Class Members in that they:

a. Paid a sum of money for Products that were not what Defendant represented;

b. Paid a premium price for Products that were not what Defendant represented;

c. Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendant warranted;

d. Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented;

e. Could not be used for the purpose for which they were purchased; and

f. Were of a different quality than what Defendant promised.

77. Had Defendant not made the false, misleading, and deceptive representations, Plaintiff and the Class Members would not have been willing to pay the same amount for the Products they purchased, and, consequently, Plaintiff and the Class Members would not have been willing to purchase the Products.

78. Plaintiff and Class Members bargained for a product that was safe to consume and were thus deprived of the basis of their bargain when Defendant sold

them a Product containing BVO is toxic, banned by federal and state regulators, and exposes Plaintiff and Class Members to potentially severe health consequences.

79. No reasonable consumer would expect the Product, a beverage, to cause neurological symptoms, hypothyroidism, and depression. Due to the negative health effects associated with the consumption of BVO containing products, Plaintiff and Class Members will have to go undergo periodic medical testing to detect and protect themselves from future injury or illness. Accordingly, Plaintiff and Class Members were injured as a result of purchasing the Product, including, among other things, they purchased and paid for a product that did not conform to what was promised as promoted, marketed, advertised, packaged, and labeled by Defendant; and they were deprived of the benefit of their bargain; and they spent money on a product that did not have any value or had less value than warranted or that they would not have purchased and consumed had they known the truth about the product.

80. Additionally, because the facts concern a safety-related deficiency in the Product, Defendant was under a continuous duty to disclose to Plaintiff and the Class Members the true nature of the Product and to disclose the Product contained a substance known to cause adverse health effects. Furthermore, Defendant, as the owner, manufacturer, marketer, and seller, had a duty to disclose because of Defendant's exclusive and/or superior knowledge concerning the composition of the Product.

81. Although Defendant disclosed the Product contained "Brominated Vegetable Oil" or otherwise indicated it was "Brominated," Defendant omitted and concealed the fact that consumption of Brominated Vegetable Oil was banned by federal and state regulators and known to have significant health consequences. Thus, Defendant's conduct deceived Plaintiff into believing consumption of the Product was safe.

82. The overwhelming majority of beverage brands have already removed BVO from their products due to its toxicity, Defendant knew, or reasonably should have known, that this information is material to reasonable consumers, including Plaintiff and Class Members, when they make their purchasing decisions, yet Defendant did not disclose this material information.

83. Defendant made material omissions during the class period, including prior to and at the time of Plaintiff's purchases, despite Defendant knowing, or reasonably should have known, the risk presented by using BVO in the Product. These material omissions of fact occurred throughout the United States and were missing from the labels, packaging, and marketing materials for the Product. Plaintiff viewed the labels, packaging, and advertising associated with the Product and would not have known that use of the Product would expose them to toxic and banned chemicals.

84. Plaintiff and Class Members purchased, and paid a premium, or otherwise paid more for the Product than they otherwise would have—had they

known that the Product contained toxic, harmful chemicals. Defendant was best positioned to know of the prolonged effects of BVO in its products and failed to disclose the consequences of repeated consumption of the Product to consumers.

85. Plaintiff and the Class Members paid for Products that were purported to be safe. The products Plaintiff and the Class Members received were worth less than the products for which they paid.

86. As a result of these unfair and deceptive practices, Defendant has likely collected millions of dollars from the sale of the Products that they would not have otherwise earned. Plaintiff and Class Members paid money for food items that are not what they purported to be or what they bargained for.

87. In making the false and misleading representations described herein, Defendant knew and intended that consumers would pay for, and/or pay a premium for, a product labeled and advertised as being lawful and safe.

**H. Defendant deceives consumers by misrepresenting that the Products are lawful and safe.**

88. Consumers seek these types of products for various reasons, including perceived benefits of attaining health and wellness for themselves and their families.

89. Defendant capitalizes on the consumer's demand for lawful and safe food products and generates increased unit sales, revenue, and profit by hiding the Product's reliance on unlawful and unsafe ingredients.

90. Further, consumers rely on label representations and information in making purchasing decisions.

91. Knowing this, Defendant omits language indicating that its Product contains unsafe ingredients and is not authorized for sale.

92. This leads consumers to believe that the Product is safe and authorized for sale.

93. Reasonable consumers – accustomed to companies complying with federal and state regulations and solely using safe ingredients authorized for use in food and beverage products– accept this representation to mean that the Product does not contain unsafe ingredients not authorized for sale.

94. Based on the representations that appear on the packaging of the Products, Plaintiff reasonably believed that the Products were safe and authorized for sale.

95. Rather, Defendant's Products are not authorized for sale because they contain the unlawful and unsafe ingredient BVO.

96. Defendant's deceptions harm not only consumers but also companies that accurately represent its products by diverting attention and dollars away from competitors that are good faith market participants.

**I. The Products are misbranded.**

97. Because the Products contain banned and unsafe ingredients without properly disclosing the risks associated with consumption, the Products are misbranded under federal and state laws.

98. The Products' labeling fails to alert consumers to the undue health risk associated with consuming the product and that the Products' contain ingredients that are not authorized for use in food.

99. The Products therefore violate federal and state consumer protection laws.

100. The U.S. Food, Drug, and Cosmetic Act regulations require that a food's label accurately describe the food product, its characterizing flavors, and all ingredients. *See*, 21 C.F.R. 102.5(a).

101. Pennsylvania's Food Safety Act has adopted the entirety of the FDCA.

102. Under FDCA section 403, a food is "misbranded" if "its labeling is false or misleading in any particular." *See* 21 U.S.C. §§ 343(a).

103. The lawfulness, authorization to sell, and safety of consuming the Products has a material bearing on price and consumer acceptance. Moreover, Defendant's marketing and labeling of the Product including but not limited to the absence of language informing consumers that the Products contain unsafe ingredients not authorized for sale in food and beverage products creates the erroneous impression that the Products are lawful and safe to consume.

104. Because the Defendant fail to reveal the basic nature and characterizing properties of the Products (specifically, the presence of unauthorized ingredients and the health risks associated with their consumption), Defendant's Products are not only sold with misleading labeling but also misbranded under Sections 403(a) of the Food Drug & Cosmetic Act ("FDCA"), 21 U.S.C. §§ 343(a), and cannot be legally manufactured, advertised, distributed, or sold in the U.S. as it is currently labeled. *See* 21 U.S.C. § 331.

105. Moreover, Pennsylvania law forbids the misbranding of food in language identical to that found in the FDCA.

106. The Products are misbranded under Pennsylvania's Food Safety Act.

107. The Food Safety Act states: "All regulations and supplements thereto or revisions thereof adopted under the Federal acts which relate to food on, before or after the effective date of this subchapter are adopted as regulations in this Commonwealth." 3 Pa. Stat. and Cons. Stat. Ann. § 5733. Also, the Food Safety Act mandates that all regulations thereunder, must "be construed in a manner that is consistent with the Federal acts and regulations promulgated under those acts." 3 Pa. Stat. and Cons. Stat. Ann. § 5736. Specifically, "food standards and labeling requirements" must be consistent with Federal regulations. *Id.*

108. By misrepresenting the basic nature and characterizing properties of the Products, Defendant violates these federal and state regulations and misleads Plaintiff and other reasonable consumers.

## CLASS DEFINITIONS AND ALLEGATIONS

109. Plaintiff brings this action on behalf of the following classes:

a. Pennsylvania Class: All persons who purchased Defendant's Products within the Commonwealth of Pennsylvania and within the applicable statute of limitations period;

b. Nationwide Class: All persons who purchased Defendant's Products within the United States and within the applicable statute of limitations period (collectively, the "Classes," "Class," and "Class Members").

110. The questions of law and fact relating to Defendant's conduct, and the inequity and impropriety of that conduct, as more fully set forth above, are questions which are common to and affect the entire Class. These common questions predominate over and are a necessary precedent to any questions affecting only individual Class Members.

111. The claims of the named Class Representative are typical of the claims of the Class.

112. While the exact number of Class Members is not yet known, subject to discovery, it is believed and therefore averred that the Class numbers in the tens of thousands. While the Class is numerous, it is believed that Defendant maintains extensive records relating to the mislabeled Products sold in Pennsylvania as described in this Complaint, along with the identity of Class Members.

113. Individual actions by members of the Class would, as a practical matter, be dispositive of the interest of members who are not parties, and may substantially impede his or her ability to protect his or her interest and/or create or lead to inconsistent adjudications.

114. In view of the potential expenses of litigation, the separate claims of individual Class Members are insufficient to support the thousands of separate actions. A Class Action is the most expeditious and cost-effective method of addressing Defendant's improper conduct in Pennsylvania.

115. Defendant, as more fully set above, has acted and/or refused to act on grounds generally applicable to the Class by engaging in conduct which is contrary to Pennsylvania law, which constitutes unfair and/or deceptive conduct under Pennsylvania law, breaches implied warranties, and unjustly enriches Defendant.

116. It is believed and therefore averred that counsel for the Class Representative will diligently and adequately represent the interests of the Class.

117. The Class Representative, after reasonable inquiry, has determined that he has no conflict of interest in the maintenance of the Class Action, and has or can acquire adequate financial resources to ensure that the interests of the Class will not be harmed.

## CAUSES OF ACTION

### COUNT I
### Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. §§ 201-1 *et seq.*

118. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

119. Plaintiff brings this Count individually and on behalf of the members of the Pennsylvania Class.

120. Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1 et seq. (the "UTPCPL") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ."

121. The UTPCPL specifically defines what constitutes unfair methods of competition and unfair or deceptive acts or practices. Defendant engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its trade and commerce in violation of the UTPCPL, including the following:

(a) representing that its goods and services have characteristics, uses, benefits, and qualities they do not have (73 Pa. Cons. Stat. § 201-2(4)(v));

(b) representing that its goods and services are of a particular standard or quality if they are another (73 Pa. Cons. Stat. § 201-2(v)(vii));

(c) advertising its goods and services with intent not to sell them as advertised (73 Pa. Cons. Stat. § 201-2(4)(ix)); and

(d) engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding (73 Pa. Cons. Stat. § 201-2(v)(xxi)).

122. Defendant is a "person," as meant by 73 Pa. Cons. Stat. § 201-2(2).

123. Plaintiff and the Class Members purchased goods and services in "trade" and "commerce," as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes.

124. As alleged more fully above, Defendant has violated the Unfair Trade Practices and Consumer Protection Law by misleadingly, deceptively, and falsely representing to Plaintiff and the other members of the Class that the Products are lawful and safe to consume when in fact they are neither lawful nor safe to consume.

125. Defendant's omissions and misrepresentations included lying about the quality of its Products because they are not lawful to sell and are not safe to consume. Defendant additionally engaged in deceptive conduct which created the likelihood that Plaintiff would misunderstand the nature of the Products when Defendant represented that its Products were lawful to sell and safe to consume. Defendant's Products do not conform as they are warranted and represented.

126. Defendant knew or should have known that when the Products left its control, that they were not in conformity or consistent with representations on the

labels. Accordingly, Defendant's Products did not provide the represented and warranted benefits.

127. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

128. Defendant intended that Plaintiff and other Pennsylvania Class Members rely on its omissions and misrepresentations, and this reliance was crucial to Defendant commanding a premium price for the Products.

129. As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff and the Pennsylvania Class have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

130. Plaintiff and other members of the Class lost money or property as a result of Defendant's violations because: (a) they would not have purchased the Products on the same terms if they knew that the Products were unlawful, included ingredients not authorized for food and beverage products, and were unsafe to consume; (b) they paid a price premium compared to other consumer products due to Defendant's misrepresentations; and (c) the Products do not have the characteristics, uses, or benefits as promised.

131. Defendant deceived and continues to deceive consumers about the quality and ingredients of the Products. This conduct constitutes unfair or deceptive

acts or practices within the meaning of the UTPCPL. This illegal conduct by Defendant is continuing, with no indication that it will cease.

132. Accordingly, Defendant's deceptive, false and misleading statements deceived Plaintiff and Pennsylvania Class Members and a substantial segment of the target consumer audience and improperly influenced consumers' purchasing decisions, as Plaintiff and Pennsylvania Class Members relied on such misrepresentations in violation of the UTPCPL.

133. Plaintiff and the Pennsylvania Class seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $100 (whichever is greater), treble damages, attorneys' fees and costs, and any additional relief this Court deems necessary or proper.

**COUNT II**
**Breach of the Implied Warranty of Merchantability**

134. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

135. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against the Defendant.

136. The Products are goods and Defendant, as the manufacturer, marketer, distributor, and seller of the Products, is a merchant within the meaning of the Uniform Commercial Code, as adopted in Pennsylvania.

137. Defendant developed, manufactured, distributed, marketed, advertised, and sold the Products directly to or for their eventual sale to end users.

138. Defendant impliedly warranted to Plaintiff and Class Members, prior to their purchase of the Products, that the Products were merchantable and reasonably fit for the purposes for which such products are used and that the Products were acceptable in trade for the product description.

139. Plaintiff and Class Members also relied upon Defendant's partial representations, and but for the omissions described herein, Plaintiff and Class Members would not have purchased the Products on the same terms.

140. Plaintiff and Class Members purchased the Products that were manufactured and sold by Defendant in consumer transactions. The implied warranty of merchantability attached to the sale of these Products.

141. Implied in the contract was a warranty that the Product was merchantable at the time of sale. Furthermore, at the time the contract was formed, Defendant knew, or should have known, that Plaintiff and Class Members were relying on Defendant's skill or judgment in determining whether the Product was safe to consume and was free from hidden defects that would make the Product unsuitable for its intended purpose.

142. The Product is unfit for the ordinary purposes for which such goods are used because repeated consumption of beverages containing brominated vegetable oil has significant health consequences.

143. Plaintiff and Class Members were significantly exposed to food and beverage products containing BVO, a proven hazardous substance, as a direct and

proximate result of Defendant's breach of implied warranties. Plaintiff and Class Members would not have purchased the Product had they known the Product did not conform to the warranties. As a consequence of Defendant's breach of implied warranties, Plaintiff and Class Members suffered, and continue to suffer, financial injury.

144. Plaintiff and Class Members have been injured such that notice to Defendant is not required.

145. Prior to the filing of this complaint, Defendant was provided written notice of these breached warranties.

146. Defendant did not respond to this written notice.

147. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class Members have suffered actual damages in that they have purchased Products of inferior quality and ingredients compared to how they were represented. Defendant's Products are worth far less than the price Plaintiff and the Class Members paid, and Plaintiff and Class Members would not have purchased the Products at all if they had known of the true quality and nature of Defendant's Products.

148. Plaintiff, on behalf of himself and the Class Members, demand judgment against Defendant for compensatory damages for himself and each of the other Class Members, as well as attorneys' fees, interest, costs, and any appropriate injunctive relief.

**COUNT III**
**Fraudulent Concealment**

149. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

150. Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against the Defendant.

151. At all relevant times, Defendant was engaged in the business of designing, manufacturing, and selling the Product.

152. Defendant aimed to portray the Product as safe for frequent and repeated consumption and omitted key facts concerning the potential harm from consumption of BVO, a key ingredient in the Product.

153. Defendant, acting through its representatives or agents, delivered the Product to its distributors and through other channels to consumers, including the Plaintiff and Class Members.

154. Defendant, as the owner, manufacturer, marketer, and seller of the Product, had a duty to disclose because of Defendant's exclusive and/or superior knowledge concerning the composition of the Product. Defendant owed Plaintiff and Class Members a duty to disclose because the risks associated with BVO containing products were known and/or accessible exclusively to Defendant, who had superior knowledge of the facts; because the facts would be material to consumers; because Defendant actively concealed or understated them; because Defendant intended for consumers to rely on the omissions in question; and because Defendant made

partial representations concerning the same subject matter as the omitted facts. Furthermore, because the Product poses an unreasonable risk of substantial bodily injury, Defendant was under a continuous duty to disclose the Product contained a substance known to have adverse health effects.

155. Defendant willfully and knowingly omitted material information regarding the quality and safety of the Product as discussed herein. Defendant countenanced these material omissions to boost or maintain sales of the Product, and to create a false assurance that prolonged loyalty to Defendant's brand—the consumption of the Product—would not place consumers in danger. The omitted information and partial representations were material to consumers because they play a significant role in determining the value of the Product at the time of purchase.

156. Defendant's failure to disclose the potential negative health effects of consuming the Product induced the Plaintiff and Class Members to purchase the Product. Plaintiff and Class Members had no way of knowing that Defendant's representations were false or misleading.

157. Although Defendant had a duty to ensure the accuracy of the information regarding the Product because such information was within the exclusive knowledge of Defendant and because the information pertains to serious health issues, Defendant failed to satisfy its duty.

158. Defendant engaged in fraudulent and deceptive conduct by devising and executing a scheme to deceptively convey that their products were safe. Defendant's actions were done to gain a commercial advantage over competitors, and to drive consumers, like the Plaintiff and Class Members, away from purchasing a competitor's product.

159. As a direct and proximate consequence of their reliance on Defendant's omissions and partial representations, Plaintiff and Class Members were significantly exposed to food and beverage products containing BVO, a proven hazardous substance.

160. Plaintiff and Class Members would not have purchased the Product, or paid as much for the Product, had they known the truth. As a consequence of Defendant's fraudulent and deceptive conduct, Plaintiff and Class Members suffered, and continue to suffer, financial injury.

161. As a further proximate result of the Defendant's fraudulent and deceptive conduct, Plaintiff and Class Members suffer a significantly increased risk of contracting a serious latent disease, including, but not limited to, hypothyroidism or other neurological disorders; that increased risk makes periodic diagnostic medical examinations reasonably necessary; and monitoring and testing procedures exist which make early detection and treatment of the disease possible and beneficial.

162. Plaintiff and the Class Members have suffered damages in an amount to be determined at trial that, among other things, refunds the amount Plaintiff and the Class Members paid for the Product, awards medical monitoring expenses, costs, interest and attorneys' fees.

## COUNT IV
## Negligent Misrepresentation

163. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

164. Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against the Defendant.

165. As discussed above, Defendant misrepresented that the Products were lawful to sell and were safe to consume. In light of these misrepresentations, Defendant had a duty to disclose that ingredients in its Products were not, in fact, safe to consume.

166. At the time Defendant made these representations and omissions, Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

167. At a minimum, Defendant negligently misrepresented and/or negligently omitted material facts about Products.

168. The negligent misrepresentations and omissions made by Defendant, upon which Plaintiff and Class Members reasonably and justifiably relied, were

intended to induce and actually induced Plaintiff and members of the Classes to purchase Products.

169. Plaintiff and Class Members would not have purchased Products if the true facts had been known.

170. The negligent actions of Defendant caused damage to Plaintiff and members of the Classes, who are entitled to damages and other legal and equitable relief as a result.

**COUNT V**
**Unjust Enrichment**

171. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

172. Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against the Defendant.

173. At all times relevant hereto, Defendant deceptively marketed, advertised, and sold merchandise to Plaintiff and the Classes.

174. Plaintiff and Class Members conferred upon Defendant nongratuitous payments for the Products that they would not have if not for Defendant's deceptive advertising and marketing.

175. Defendant accepted or retained the nongratuitous benefits conferred by Plaintiff and Class Members, with full knowledge and awareness that, as a result of Defendant's deception, Plaintiff and Class members were not receiving a

product of the quality, nature, fitness, or value that had been represented by Defendant and reasonable consumers would have expected.

176. At the time of Plaintiff and Class Members' purchases, Defendant knew of the synthetic ingredients used in its Products. Knowing that their representations were false, Defendant sold the Products to Plaintiff and Class Members at a premium price. Accordingly, Defendant continues to retain a benefit improperly obtained to the detriment of Plaintiff and Class Members.

177. Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class Members' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because of Defendant's misrepresentations about the Products, which caused injuries to Plaintiff and Class Members because they would not have purchased the Products if the true facts had been known.

178. Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and Class Members is unjust and inequitable, Defendant must pay restitution to Plaintiff and Class Members for their unjust enrichment, as ordered by the Court.

**COUNT VI**
**Negligence**

179. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

180. Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against the Defendant.

181. Because the facts concern a safety-related deficiency in the Product, Defendant was under a continuous duty to disclose to Plaintiff and Class Members the Product contained a substance known to cause adverse health effects. Furthermore, Defendant, as the owner, manufacturer, marketer, and seller, had a duty to disclose because of Defendant's exclusive and/or superior knowledge concerning the composition of the Product.

182. Although Defendant disclosed the Product contained "brominated vegetable oil" or otherwise indicated it was "brominated," Defendant omitted and concealed the fact that consumption of BVO was known to cause hypothyroidism and other neurological disorders.

183. Because of these negative effects, numerous beverage manufacturers, including Coca-Cola and PepsiCo, removed BVO from all products in 2014. As a manufacturer and distributor of carbonated beverages, Defendant knew, or should have known, that consumption of BVO posed serious health concerns.

184. Despite Defendant's knowledge that repeated consumption of bromine has toxic effects, Defendant breached its duty of care owed to Plaintiff and Class Members by placing the Product into the stream of commerce.

185. Plaintiff and Class Members were significantly exposed to beverage products containing BVO, a proven hazardous substance, as a direct and proximate

result of Defendant's negligence. As a consequence of Defendant's negligence, Plaintiff and Class Members suffered, and continue to suffer, financial injury.

186. As a further proximate result of Defendant's negligence, Plaintiff and Class Members suffer a significantly increased risk of contracting a serious latent disease, including, but not limited to, hypothyroidism or other neurological disorders; that increased risk makes periodic diagnostic medical examinations reasonably necessary; and monitoring and testing procedures exist which make early detection and treatment of the disease possible and beneficial.

187. Plaintiff and the Class Members have suffered damages in an amount to be determined at trial that, among other things, refunds the amount Plaintiff and the Class Members paid for the Product, awards medical monitoring expenses, costs, interest and attorneys' fees.

**COUNT VII**
**Negligent Failure to Warn**

188. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

189. Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against the Defendant.

190. Defendant manufactured, designed, marketed, and sold the Product in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the Product.

191. Despite Defendant's knowledge that repeated consumption of bromine has toxic effects, Defendant placed the Product into the stream of commerce.

192. Defendant's Product was defective due to inadequate warning and/or inadequate testing and study, and inadequate reporting regarding the results.

193. Defendant's Product was defective due to inadequate post-marketing warning or instruction because, after Defendant knew or should have known of the risk of injury from the BVOs used in the Product, Defendant failed to provide adequate warnings to the Plaintiff, Class Members, and public and continued to promote the Product as safe and effective.

194. The defective warnings and labeling on the Product and BVO used in the beverage were substantial factors in bringing about the injuries to the Plaintiff and Class Members.

195. As the direct and proximate cause of the defective condition of the Product manufactured and supplied by Defendant, and specifically Defendant's failure to warn, and Defendant's other negligence or actions described herein, Plaintiff and Class Members were significantly exposed to beverage products containing BVO, a proven hazardous substance. Thus, Plaintiff and Class Members suffered, and continue to suffer, financial injury.

196. As a further proximate result of Defendant's negligence, Plaintiff and Class Members suffer a significantly increased risk of contracting a serious latent disease, including, but not limited to, hypothyroidism or other neurological

disorders; that increased risk makes periodic diagnostic medical examinations reasonably necessary; and monitoring and testing procedures exist which make early detection and treatment of the disease possible and beneficial.

197. Plaintiff and the Class Members have suffered damages in an amount to be determined at trial that, among other things, refunds the amount Plaintiff and the Class Members paid for the Product, awards medical monitoring expenses, costs, interest and attorneys' fees.

**COUNT VIII**
**Strict Products Liability**

198. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

199. Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against the Defendant.

200. Plaintiff and Class Members were in the group of persons that Defendant should reasonably have foreseen as being subject to the harm caused by the defectively designed Product and/or the BVO used in the Product insofar as Plaintiff and Class Members were the types of consumers for whom the Products were intended to be used. Plaintiff and Class Members used the Products as intended.

201. Defendant, who is engaged in the business of selling, manufacturing and supplying the Product placed them into the stream of commerce in a defective

and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the Product.

202. The Product supplied to Plaintiff and Class Members was defective in design and formulation and unreasonably dangerous when they left the hands of Defendant and they reached the user and consumer of the Product, including Plaintiff and Class Members, without substantial alteration in the condition in which they were sold.

203. The Product and/or the BVO contained in them were unreasonably and dangerously defective beyond the extent contemplated by ordinary persons with ordinary knowledge regarding these products.

204. Defendant's Product was defective due to inadequate warning and/or inadequate testing and study, and inadequate reporting regarding the results.

205. Defendant's Product was defective due to inadequate post-marketing warning or instruction because, after Defendant knew or should have known of the risk of injury from the BVOs used in the Product, Defendant failed to provide adequate warnings to the Plaintiff, Class Members, and public and continued to promote the Product as safe and effective.

206. The defective design, formulation, warnings and labeling associated with the Product and BVO used in the beverage were substantial factors in bringing about the injuries to the Plaintiff and Class Members.

207. As the direct and proximate cause of the defective condition of the Product manufactured and supplied by Defendant, and specifically Defendant's failure to warn, and Defendant's other actions described herein, Plaintiff and Class Members were significantly exposed to beverage products containing BVO, a proven hazardous substance. Thus, Plaintiff and Class Members suffered, and continue to suffer, financial injury.

208. As a further proximate result of Defendant's conduct, Plaintiff and Class Members suffer a significantly increased risk of contracting a serious latent disease, including, but not limited to, hypothyroidism or other neurological disorders; that increased risk makes periodic diagnostic medical examinations reasonably necessary; and monitoring and testing procedures exist which make early detection and treatment of the disease possible and beneficial.

209. Plaintiff and the Class Members have suffered damages in an amount to be determined at trial that, among other things, refunds the amount Plaintiff and the Class Members paid for the Product, awards medical monitoring expenses, costs, interest, and attorneys' fees.

## RELIEF DEMANDED

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. For an order certifying the Class and naming Plaintiff as representatives of the Class and Plaintiff's attorneys as Class Counsel to represent the members of the Class;

b. For an order declaring the Defendant's conduct violates the statutes and laws referenced herein;

c. For an order awarding, as appropriate, statutory damages, compensatory and monetary damages, restitution or disgorgement to Plaintiff and the Class for all causes of action;

d. For an order requiring Defendant to immediately cease and desist from selling its misbranded Products in violation of law; enjoining Defendant from continuing to label, market, advertise, distribute, and sell the Products in the unlawful manner described herein; and ordering Defendant to engage in corrective action;

e. For prejudgment and postjudgment interest on all amounts awarded;

f. For an order awarding punitive damages;

g. For an order awarding attorneys' fees and expenses and costs of suit; and

h. Granting such other relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: August 6, 2025

Respectfully submitted,

/s/ Steffan T. Keeton

Steffan T. Keeton
stkeeton@keetonfirm.com
Pa. Id. No. 314635

**The Keeton Firm LLC**
100 S Commons, Ste. 102
Pittsburgh, PA 15212
1-888-412-5291

*Attorneys for Plaintiff and the Class*

**VERIFICATION**

I, James Founds, verify that the statements contained in the foregoing Class Action Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements contained herein are subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

Dated: 08 / 06 / 2025

JAMES FOUNDS

**CERTIFICATE OF COMPLIANCE**

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: Plaintiffs

Signature: ______________________

-

Name: Steffan T. Keeton

Attorney No.: 314635